The next case is No. 09-1457, Marctec LLC v. Johnson & Johnson & Cordes Corporation. Mr. Leitch. Good morning. May it please the Court. In Phillips, this Court held its bedrock principle that the claims of a patent are fine or legitimate. This Court's law is also clear that there is a distinction between product claims and process claims. In a novel product, it means the criteria of patentability is not limited to the process by which it is manufactured. In this case, the District Court erred by failing to follow these basic tenets of claims construction when it adopted constructions inconsistent with some of the treaties. You've got a problem. The prosecution history suggests heat bondable. That's your central problem. Tell us why we shouldn't read the prosecution history. Absolutely. I don't think general rules of claim construction are necessarily going to operate to answer the question here. Thank you, Your Honor. We'll go right to that issue. And that's what I was going to get to, is the bonded enemy, the surgical device implant, and the expandable impart to the briefs unless the Court has questions on those particular issues. But I will start and focus on the bonded issue. Okay. The District Court construed the term bonded to mean bonded by the application of heat. There's no question that everyone in the District Court, my opponents, my clients, all understand the term bonded. That is a common term. Their product is bonded. There's no question about that. The question becomes, do we need to read in our processing invitation to this product claim because of five words that were used in the prosecution history? No, it's more than five words. I mean, that's awfully dismissive. You've got a problem here. Well, and it's not just, in my view at least, the prosecution history. It's the claim language as well as the language and the spec concerning the summary of the invention. Well, if we can turn to this, and I'll take those in turn. If we turn to the claim language, again, the claim language talks about bonded. It does not talk about bonded by the application of heat. It only talks about the application of heat in Claim 1. Well, it talks about a characteristic, just as I can claim a flexible pen in fringe. If this pen is flexible, this pen can be in fringe even if I don't do this because it has the characteristics of that claim. So the fact of the matter is, the claim elements I believe that Your Honor is talking about are the fact that it has to have the characteristics. The polymer must have, be capable of being non-fluorable, non-adherent to room temperature and becoming fluorable, tacky, and adherent upon the application of heat. There's no question, no dispute that their polymer meets that limitation. It's whether or not we have to read in this processing invitation, which we find in Claim 8. And in fact, during the prosecution, the examiner specifically said, and this is from the prosecution history, that the... But wait, I mean, in terms of the claim language, my understanding is that this particular claim language about non-fluorable and non-adherent at room temperature was added to distinguish the Paul Mass patent, right? It was, Your Honor. And in the prosecution history, it states that in contrast, applicant's implant includes a heat-bondable material, which is bonded to the implant by the application of heat. To highlight this distinction, applicants have amended blah, blah, blah, right? So why doesn't that sink you? Well, what happened there, Your Honor, was there was a distinction for Paul Mass. Paul Mass does not talk about bonding in any way, shape, or form. There was no way for us to... Well, that doesn't make any difference. We've said again and again, you don't have to have a distinction be necessary to distinguish prior art in order to result in a claim limitation. So the fact that Paul Mass doesn't talk about bonding doesn't mean that they can say, oh, well, we don't have to worry about the concessions we made during the prosecution history because it wasn't necessary to distinguish Paul Mass on that basis. We could have come in and we could have said, well, Paul Mass doesn't involve bonding at all. Therefore, we're okay. That's not what they said. Right. And I think the distinction here, Your Honor, is the fact that this is trying to bring a process limitation to a product claim. And there is case law very specific on this. There's the Anderson line of cases where it says it is proper to do that. When you are, in fact, distinguishing the method in the prior art and you're disparaging it, there's also the Sanofi line of cases, 345 Federal Appendix 594. And what that says, and that very clearly distinguishes the Anderson line of cases, it says that I don't think you're addressing the concession that seems to be made here in the prosecution history. Here it is. Here's the language. Are you saying that it means something other than what it seems to say on the face of it? I'm certainly not. All I'm saying is that the distinction was made between bonded versus placed upon like a sheet. That was the distinction that was made. Yes, those five words were added to the end. But what we're taught in I4I and other cases is we need to, we can't pluck an individual statement out, as the quote from this report. We need to look at it in context. And if we look at what the examiner said in other places, for instance, when we tried initially to get these claims issued, we had both claim, what ended up as Claim 1, as well as Claim 8, which added by the application of heat. Claim 8 is rendered superfluous by the District Court's construction. But what happened at that point was the examiner didn't say, I'm going to allow Claim 8 because I see the distinction of uponness, because, again, that wasn't a distinction of uponness. That doesn't make any difference. If the applicant says, here's the distinction, and our claims don't include this, the person is stuck regardless of whether that convinced the examiner or didn't convince the examiner or whatever, right? Well, again, I think if you look at the Anderson line of cases versus the Sanofi line of cases, on this particular issue, it is somewhat unique where you're trying to read a process limitation into a product claim. I don't think it's as clear-cut as it is in the cases where you're simply reading product limitations into the words that are used in the product. The problem here with reading this process limitation in is there's no processing of terms in the claim. It's something I should be able to pick up, and I can't pick up their product if they sold it on the shelf. Obviously, it's not sold on the shelf. But I can pick it up. I can look at it. I can look at my claim language, and I can say, that infringes. It meets every single element. There's no dispute it does under the ordinary meaning of the claims. That's where a product claim meets. Now, I'm not going to dispute that had we, which we did in Claim 8, added that specific process limitation, we're held to that. I wouldn't dispute either had we said, had Paul Mez described some sort of other bonding process, and we said, you know what? Paul Mez describes this kind of bonding. We describe bonding by the application fee. Therefore, that's our distinction, and therefore, you know, I think in that case, I don't want to let it have a very good argument. Let me just make one other point about the prosecution history of that particular term, and that is the examiner specifically said, and this is at, let me just find the site for the court here, A5670 of the appendix. The examiner said the bonding process of the process claims by the application fee, which was in Claim 8, does not limit the structure claims. That's what the examiner found. What this court has said is that we need to look at the prosecution history in full. I'll acknowledge, as Judge Dyke has pointed out, the language by the application fee used in that one sentence is problematic, but is that a clear and unequivocal disavow when you look at the prosecution history on a whole? That's the question for this court. Well, I'm not sure that's the right standard. We're not dealing with a clear and unequivocal disclaimer. We've got words in the claim that were added here, and we have to interpret those words. It's a question of the interpretation of the language in the claim. This is not a disclaimer of something that is otherwise within the words of the claim. The claim language is ambiguous, and we're trying to construe it. And the claim language that we believe is ambiguous is the part at the end where it talks about the polymeric material. Well, at least the part that they added, but it could also be the word bonded. Well, I would suggest, Your Honor, that the part that was added, as it simply says, the polymeric material, where that polymeric material has these certain characteristics. Again, every time someone reads in certain characteristics, is it this court's law that we then have to carry out and manufacture and use all those characteristics that are in the claim characteristics of the product? And I think, in this case, there's no dispute that their product has those characteristics. The question is, do we have to? Back to my flexible pen example, if I've got a patent on a flexible pen, this pen infringes. Even if I don't do this, if I've got a patent on something that has a material on it that's non-floatable, non-adherent to room temperature, and becomes floatable, tacky, and adherent upon the application of heat, that infringes, even if I don't go take a lighter to it and heat it up and make it do those things. So, I guess that's our position on those particular terms. Now, even if we were to accept the court's instruction on bonding and that it required by the application of heat, I think what happened in this case is that we presented substantial evidence of infringement, even under the court's instruction. It's a little clear what happened at that point, unclear what happened at that point, because the court either ignored that evidence or simply revised its claim construction. What's the evidence? Well, there's several different pieces of evidence, Your Honor. The spraying? Well, no, Your Honor, that's not a part of our appeal. I think they put that in the appeal to try to, I guess, make some of our ideas sound less credible. But, really, what we have appealed as far as what evidence shows that there's bonding by the application of heat, starts with the pyridine C coating, which is the bonding agent that they put on. Well, that's an earlier stage. That's not the polymer with the therapeutic effect, right? Well, it's not, Your Honor. What they call it is part of their coating process. So, I guess it becomes a question of something that they refer to in their documents at A2146 as part of the coating process. They heat it up to 700 degrees, whether or not that is, and they call it a bonding agent. It's not, that's what they call it, A2145. It's their bonding agent. The question of fact there that was decided by the judge is that that, in fact, is not bonded by the application of heat. The next thing we have is they take these polymers, they put them in a thermal bath, they heat them up. They then get them in a state where they're flowable, tacky and adherent, just like the patent t-shirts. They then, for reasons to put the drug in, they cool it down and then spray it off. Again, this isn't what they call a coating process. It's the very polymers that are bonding to the implant. But their argument here, and what the district court said, was that, again, a factual finding, that that was not bonded by the application of heat. I submit to you, if you take this to the extreme, you have a, you put the polymer and you heat it up. Remove that heat, it's still hot, and you dip their product in it and hold it out. By their argument, that wouldn't be bonded by the application of heat, because we've removed the heat. It's there and it's been heated. I think that when you look at that clearly, that's bonded by the application of heat. And then finally, the sterilization of Japanese heat drying steps. What happens there, and this is an important point that possibly wasn't made as well as it could have been in our briefs, but they have admitted, their witnesses have admitted, that when you remove the solvent from the product, that you take that solvent out, the polymer completes its bonding. That's when the bonding really occurs. And what we've learned from, we can get it right out of their brief at page 31, they admit that the bonding occurs when the solvent is removed. Their witness at A1573, at pages 182 and 183, this was their 36th witness, said that we heat it to this 45 degrees for these Japanese products. The reason we do that is to remove the solvent from the polymer, which they again admit creates the bonding. So I think these are at least factual issues that the court should have allowed to go to the fact finder if the court is inclined to agree with the district court that bonding means bonding by the application of heat. You see, I've gone into my rebuttal time, so if there are no... You have, we'll save some rebuttal time. Let's hear from the other side. Mr. Diskin. Thank you. May it please the court. This is a very easy case of claim construction, a very easy case of summary judgment. I guess both sides agree on that, right? It's an easy case. Often they do. It's an easy case. I think on this one, and I think the... What do you say to the other side's argument or position with respect to process versus product? Two things. One is, bonding is a process itself. That is, it's not tied, it's bonded. It's a way of connecting things. This is just a more specific narrowing of the process that's already in the claim. And this court has cases, your Honor Satterlund and Judge Newman, interpreting, even if the claim didn't in the first instance require bonding, when there's an amendment over the prior art, to distinguish the prior art that asserts a bonding step, that's perfectly fine. I think there are two ways of thinking about it. In either way, it gets you to the same place. But I think in this case, we have a pattern that is all about e-bonding. So I'll talk about the prosecution history in just a second. But please, I'm sure you have, read the patent. It's all about e-bonding. I'll just point to two paragraphs. The summary of the invention. The present invention includes an assembly for use in searchable applications in humans. The assembly may include two components, at least one of which comprises a heat-bondable material. The first and second components are bonded to each other by the application of heat. That's what the patent's about. Second, and perhaps even more important, there's a definition of the term bondable. All the claims require a bondable material. The term bondable or bondable material is used to refer to any material suitable for use in searchable applications, which can be softened and made flowable by the application of heat, and which, when softened, will become tacky and bond to other materials and will flow to fill available space. That is, the term bondable is a defined term to mean heat-bondable. You could have said bondable means bonded by any means. Bondable means heat-bondable. It's a defined term. But the statement that you pointed us to starts off with saying the assembly may include two components. So why isn't the statement in the summary of the invention? Why doesn't that tell us that this is optional? Because it says at least one has to be heat-bondable material. It says the assembly may include two. It may include two. It may have three. It may have four. It may have five. But there must be at least one that would be bondable material. But look at the definition of bondable. It's a defined term. It's an adjective. Bondable means heat-bondable by definition. The verb form is bond. Ordinary English is when you define a term, its correlative terms have the same meaning. If bondable means heat-bondable, then bond means heat-bond. That's what this patent is about, which is why, when we switch over to the file wrapper, the patent agents have no trouble with this issue. The file wrapper disclaimer or statement in connection with the amendment is truly as clear as a bell. And you can read the in-contrast sentence and focus on that, but really read the two paragraphs that precede it, because the lengthy description of the disclosure contains cross-reference sites, the two paragraphs in the application, paragraph, I'm looking at A896, and there are cross-references to paragraphs 7 and 11, 34, 47, and 48 within the application. All of them are about applying heat to bond materials. So when the paragraph culminates in the observation that applicants' implant includes a heat-bondable material which is bonded to an implant by the application of heat, that is truly a summation of half a dozen paragraphs from the specification that say the same thing. It's not just five words. So it's a very, very clear claim construction issue. I think Judge Sherman is exactly right. And on summary judgment, basically it's undisputed that we spray the coating on, the solvent evaporates, and it's there. It's like spray painting a fence or spray painting a wall. The arguments that they made, each and every one, was rejected by Judge Sherman and excluded under Daubert. They claim there's some ambiguity about that. They look at paragraphs 62, 64, 68, 73, 76, 99. What about the sterilization step? Excuse me? What about the sterilization step? The evidence is that it is bonded before the sterilization step occurs. That's what their witnesses said. It is true the sterilization step drives off residual solvent. Does that contribute to the bonding? No, it's already bonded by then. Sterilization may take place weeks or months thereafter. It doesn't fall off. It has to do with being able to sell the product for human implantation to make sure that every conceivable residue of the solvent is gone. The solvent evaporates at room temperature under normal circumstances in the drying room. When that happens, it is bonded. That's the testimony of their witnesses. It's the testimony of our witnesses. It's just the fact. And the other fact is that because Judge Herman excluded all of this evidence under Daubert, they can't set those rulings aside unless they appeal them, and they didn't. They didn't appeal the Daubert findings. And two, the Daubert standard of review, the standard of review is different. The point is the standard of review. I agree they appealed the summary judgment, but the summary judgment isn't just taking every inference in their favor. It's taking every inference with respect to evidence in their favor. The judge excluded this evidence under Daubert. Those rulings can only be set aside for the use of discretion, and they did not attempt to prove that that's what he did. I thought he excluded the sterilization because he didn't think that it proved the point, that it wasn't relevant. He did two things. He excluded their evidence. Well, what was the matter with the evidence under Daubert of the sterilization standard? The matter with the evidence under Daubert was that it was not related to, it was not helpful to resolving the issue beforehand. See, that doesn't sound like Daubert to me. That sounds like it's a ruling that it's not relevant. Daubert expressly permits courts to exclude evidence that's not helpful or relevant to find or affect. But be that as it may. Not if he's wrong about the relevance of it. I'll have you look at it any way you care to. I think it was a completely correct ruling under the Batch before the district court. If there are no more questions, I'll sit down. Are there any more questions? No. Any more questions from the students here? Thank you. Any more questions? Mr. Much? Thank you. I may give you a few more seconds. Were you in for something that Mr. Diskin forgot? I certainly was. Mr. Diskin finished his thought. The note from the Penak Gallery reports that the sterilization was excluded because it was based upon an experiment conducted by their expert in which he took a 2.3-kilogram weight and crushed the polymers together and suggested that under that crushing process they could bind at 35 degrees, which is the temperature at which the sterilization occurred. So with that supplementation... Okay. Thank you. Okay. Please record. If I can start with the Daubert exclusion. First of all, what happens here, and I hope it's clear in our briefs, is we brief the Daubert issue. That was rendered to me. It was never decided. What happened was they brought Daubert issues, not in the briefing of their summary judgment motion. They brought them in the reply. We then asked the court. We said, how do we respond to this? The court said, don't worry. I'm not going to consider anything in the reply. Despite that, the court then went forward and signed their third proposed order where they put all these Daubert issues into the record. So to say that that has been resolved, I don't even know what opinion that I can appeal from that because it wasn't fully decided by the court. Now, the fact of the matter is we don't rely upon the facts that they claim were excluded under Daubert. I don't need an expert. I can show you their documents where they say we keep this to certain degrees. That is a fact. That is a fact not in dispute. The question is whether the court was proper in excluding either from additional claim construction or by making a factual determination that those various different ways that they heat the product during their coating process is in fact bonding by the application of heat. That's the real question there. Now, just to go back to the claim construction just for a minute, I asked the court to look at the Anderson versus the Sanofi line of cases. I think there is a real distinction here, and I think if you see how Sanofi distinguished Anderson and the basis upon which it distinguished Anderson, it's nearly identical to the facts in this case. What Sanofi said was in Anderson the reason that we were willing to read and process limitations into this product claim is because the applicant went out of their way to disparage other types of I'll use bonding because that's what's in this case, but other types of methods. That didn't happen here. We never went out of our way to disparage any other kind of method. This invention is not about bonding. This is an assembly which takes a polymeric material, it takes a drug, it puts it in it, it uses that polymer to both bond and deliver the drug onto an expandable device. There's a lot of discussion in the appeal about, well, Dr. Bunyik didn't invent the stent product. Dr. Paulness didn't invent the stent either. The stent's been around since the 1800s. It was invented by a dentist as an implant for teeth. That's not what this is about, and whether or not they may have additional value in the underlying stent, it's a question for damages.